UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*)
)
ELIZABETH TROIANI, individually and on )
behalf of her minor son PAUL-ANTHONY )
HART )
)
    Plaintiffs )
) 04 10639 RWZ
    v. )  Civil Action No.
)
CITY OF SOMERVILLE )
CHIEF DONALD CALIGURI, )
CAPTAIN DANIEL MATTHEWS, )
SERGEANT JOHN AUFIERO, )
DETECTIVE DANIEL F. REGO, )
OFFICER JAMES MCNALLY, )
OFFICER ANTHONY MANZELLI, )
OFFICER THOMAS LEYNE, and )
OFFICER(S) JOHN DOE(S) )
    Defendants )
)
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## COMPLAINT

### INTRODUCTION

1.    This is a civil rights action for money damages brought against the City of Somerville, its Police Chief and multiple police officers for injuries caused by an unconstitutional, warrantless strip search of plaintiff in a private home in Somerville. This violation of

Elizabeth Troiani's constitutional and federal and state statutory rights occurred despite the fact Ms. Troiani was never arrested and never charged with any crime. This conduct was directly attributable to pervasive mismanagement by supervisory personnel of the City of Somerville's police department and the City's toleration of patterns of misconduct and mismanagement by Somerville police which permeated the Somerville Police Department. These practices were documented in an extensive internal study of the Somerville Police Department completed only four months before this incident. In that report the internal study characterized the Somerville Police Department as a "house of hate". Plaintiff also asserts negligence claims pursuant to Massachusetts law against the City of Somerville.

## JURISDICTION

2. This action is brought pursuant to 42 U.S.C. Sections 1983 and 1988 and upon the Fourth, Fifth and Fourteenth Amendments to the United States Constitution. Jurisdiction is based upon 28 U.S.C. Sections 1331 and 1343. Plaintiffs further invoke the pendent jurisdiction of this Court to hear and decide claims arising under Massachusetts law.

## PARTIES

3. Plaintiff, Elizabeth Troiani was, at all times relevant to the complaint, a resident of the Commonwealth of Massachusetts living in the City of Somerville. She was employed as a teacher at Somerville High School.

4. Paul-Anthony Hart, is Elizabeth Troiani's minor son and was at all times relevant to

this complaint a resident of the Commonwealth of Massachusetts living in the City of Somerville with his mother.

5. Defendant City of Somerville is a municipal corporation organized pursuant to the laws of The Commonwealth of Massachusetts, with a usual place of business at 93 Highland Avenue, Somerville, Massachusetts.

6. Defendant Donald Caliguri was Chief of Police of the Somerville Police Department at all times relevant to this complaint. Chief Caliguri is sued in his individual capacity.

7. Defendant Captain Daniel Matthews was at all times relevant to this complaint a Police Officer employed by the City of Somerville. Captain Matthews is sued in his individual capacity.

8. Defendant John Aufiero was at all times relevant to this complaint a Sergeant in the Somerville Police Department. He is sued in his individual capacity.

9. Officer Daniel F. Rego carried the rank of inspector and was at all times relevant to this complaint employed as a Police Officer by the City of Somerville. Inspector Rego is sued in his individual capacity.

10. Officer James McNally was at all times relevant to this complaint a Police Officer employed by the City of Somerville. He is sued in his individual capacity.

11. Officer Anthony Manzelli was at all times relevant to this complaint a Police Officer employed by the City of Somerville. He is sued in his individual capacity.

12. Officer Thomas Leyne was at all times relevant to this complaint a Police Officer employed by the City of Somerville. He is sued in his individual capacity.

13. Officer John Doe, whose identity is not yet known, was at all times relevant to this complaint a Police Officer employed by the City of Somerville. He is sued in his individual capacity.

14. At all times the actions of the Defendant Police Officers in this complaint were taken under color of laws of the Commonwealth of Massachusetts.

## FACTS

15. On April, 5 2001, Elizabeth Troiani was a high school teacher at Somerville High School. She was an English teacher, a home tutor and she was also the cheerleader coach. She had been a teacher in Somerville in excess of ten years.

16. Elizabeth Troiani was completing an afterschool tutoring session at 34 Putnam Street, Somerville at the home of Nicole Erb, a Somerville high school student, who had been absent from school for several weeks and had been assigned to Ms. Troiani for extra work to allow her to keep pace with her regular class assignments. By April 5th, Ms. Troiani had been tutoring Nicole for more than a month.

17. At the end of the tutoring assignment on April 5th as Ms. Troiani was leaving the Erb home to pick up her son Paul-Anthony at his day care she was stopped at the entry way of the Erb home by numerous Somerville Police Officers and Nicole's father Gary Erb, who forced her back into the residence and began to interrogate her about whether or not she had removed "pills" from the Erb home.

18. Ms. Troiani was verbally abused, threatened, berated, insulted and accused of committing criminal acts by multiple Somerville officers, including but not limited to Daniel Rego,

Anthony Manzelli, James McNally, Thomas Leyne and others.

19. Ms. Troiani was threatened with criminal prosecution, told she would lose custody of her son. She was told that she would lose her job unless she co-operated with the Police Officers. She was called a "loser" and derogatory personal comments were made about her appearance and behavior. She was told she would go to prison for "ten years".

20. At this point there were at least four police officers in the home and there were several police cruisers scattered outside on Putnam Street.

21. After being forcibly detained in the home and denied permission to leave, Ms. Troiani was ordered to empty her pockets and turn them inside out so that she could be searched. During this entire period of time Ms. Troiani repeatedly asked what was going on and what was involved. The police responses were additional threats, and comments relating to going to jail, losing custody of her child, and losing her teaching license.

22. This abuse occurred in front of the student Nicole Erb, her father, her mother and grandmother. Officers were in plain clothes and uniform. Numerous officers came and went during the interrogation. On a direct order from the police officers, most probably Detective Rego, Ms. Troiani emptied her pockets and turned them inside out. The officers demanded her car keys. Defendant officers also demanded her pocketbook, which she did not have on her possession. Defendants seized Ms. Troiani's car keys and ordered her to sit down.

23. When the police continued to threaten Ms. Troiani with loss of her teaching license, going to jail and losing custody of her son, Ms. Troiani said that she needed a lawyer.

She was ignored and told she had better cooperate.

24. During this period of time Ms. Troiani emphasized over and over again to the officers that not only did she not have anything in her pockets or on her person that she had not taken anything. Ms. Troiani told the officers "I can't give you what I don't have." When she asked to make a call to the day care center where her son was being held and where she was expected to pick him up, the officers refused. At some point the officers discussed whether a female officer was on duty and told Ms. Troiani that unless she immediately cooperated she would be strip searched. Ms. Troiani reiterated that she couldn't give them what she did not have.

25. During the course of the detention in the Erb home it became apparent that no female Somerville officer was on duty. One of the officers directed that Tufts University be called to see if Tufts had a female officer available. At approximately 4:45 p.m., Officer Lori Murphy of Tufts University was dispatched to the home on 34 Putnam Street. Upon arrival she was met by several Somerville police along with Detective Rego.

26. Officer Murphy was told that the female, Ms. Troiani, was suspected of having small white pills in her possession. Assuming that Trioani was under arrest, at the order of the Somerville officers Ms. Murphy proceeded to take Ms. Troiani to an adjacent room to conduct a strip search.

27. One of the officers asked Gary Erb where Ms. Troiani could be strip searched and he pointed out an adjacent room. Ms. Murphy told Ms. Troiani that she had to strip search her pursuant to the orders of the Somerville police. Officer Murphy escorted Ms. Troiani

through the main living room into another room past Gary Erb, Nicole Erb, several police officers and another woman, who is believed to be Nicole's grandmother.

28. When they entered the adjacent rooms Ms. Troiani asked Officer Murphy if the door could be closed because of all the men present in the adjacent room. Officer Murphy agreed and attempted to shut the door, but the door would not shut. Officer Murphy the asked if the door could be shut and the woman responded "no, but nobody will come in." Officer Murphy then began the search.

29. Officer Murphy asked Ms. Troiani if she had any needles or weapons to which Ms. Troiani responded negatively. Officer Murphy the turned Ms. Troiani around and passed her hands through her hair, her ears and her neck. Ms. Troiani was then turned back one half turn so that she was sideways to Officer Murphy. Officer Murphy then put on black leather gloves and instructed Ms. Troiani to remove her shirt which she did. Officer Murphy then ran her hand over Ms. Troiani's body while her back was to the open door.

30. Ms. Murphy told Ms. Troiani to remove her bra, which she did. Troiani was then directed to remove her shoes, which she did. She then was asked to remove her socks, which she did. Officer Murphy inspected each item of Troiani's clothing as it was removed.

31. Officer Murphy then asked Ms. Troiani for her pants and Ms. Troiani asked if she could please have her shirt back since the door was wide open and there were multiple adult male police officers outside the door along with members of the Erb family. Officer Murphy responded that the strip search procedure would not permit her to dress until

the search was totally completed.

32. By this point Ms. Troiani was in shock and complied with the removal of her pants and then her underpants. Ms. Troiani stood in a room totally naked with an open door to an adjacent room where various male police officers were standing and milling around. Officer Murphy then turned Ms. Troiani around completely so that her back was to Officer Murphy. Ms. Troiani was directed by Officer Murphy to bend at the waist and to spread her buttocks so that Officer Murphy could examine her rectal area. In shock Ms. Troiani complied.

33. After conducting a visual cavity search of Ms. Troiani's rectal and vaginal area Officer Murphy told Ms. Troiani that she was free to put her clothes back on and get dressed. When Ms. Troiani finished dressing she was again physically escorted through the doorway by Officer Murphy who then proceeded to have a conversation with the Somerville officers. Officer Murphy told the Somerville officers that she found no contraband on Ms. Troiani during the search.

34. After an interchange of several minutes the Tufts officer turned to Ms. Troiani and said "you can go." Ms. Troiani told Officer Murphy that she had given her keys to a Somerville police officer earlier in the interrogation and she asked for assistance in retrieving the keys. Officer Murphy complied with her request and Ms. Troiani was given her keys and left the Putnam Street residence, as did Officer Murphy. When Ms. Troiani stepped outside she observed several police cruisers parked across and through the middle of the street. Ms. Troiani left the Putnam Street residence and walked up to

the high school where she retrieved her pocketbook and her car and left to pick up her son Paul-Anthony at day care.

35. During this entire period Ms. Troiani was never read her rights or given the opportunity to speak with counsel, despite her request. She was never told what she had allegedly stolen except for the description of "pills" and she was never arrested. She was simply forcibly detained while her constitutional rights were systematically violated.

36. Ms. Troiani was never charged with any criminal offense.

37. The following morning defendant Captain Daniel Matthews along with Lieutenant Charles Femino came to Somerville High School demanding to meet with Ms. Troiani. Instead, they met with Principal Galligani who had been told of the incident by Ms. Troiani earlier that morning. Mr. Galligani expressed shock and outrage at what had occurred. The Principal demanded to know how the police could have behaved in such a manner. The teacher was in the home in order to assist and tutor a child. The police responded, in essence, that they had more than ample justification for doing what they did and that if Ms. Troiani was accused of stealing pills they had more than enough "probable cause" to act the way that the officers had acted. The Principal responded that what ever the justification was for an interrogation there was no possible justification for a strip search.

38. Initially Matthews and Femino denied there was a strip search and when the point was pressed, a call was made to Tufts University where defendant Matthews was told that, in fact, at the direction of the Somerville officers a strip search at the Putnam Street

residence had occurred.

39. Defendant Matthews along with Lt. Femino had a further conversation with Mary Ripley, a building representative of the Somerville Teachers Association at the High School. Ms. Ripley expressed bewilderment, anger and confusion at how the police could have behaved in such a way. Defendant Matthews said in essence Ripley didn't know what she was talking about and the police had ample justification to do exactly what they had done that morning, that he knew the law and that she didn't. His behavior was loud, intimidating and threatening.

40. As a result of this incident Ms. Troiani was placed on administrative leave by the school until an investigation was completed. She was subsequently reinstated by school department officials, although as a result of the extreme psychological stress she was unable to return to her teaching position for the remainder of the school year.

41. Ms. Troiani has suffered from acute post traumatic stress syndrome and she has had a severe exacerbation of a childhood rheumatoid arthritis, a recurrence of a preexisting hepatitis C condition, which was diagnosed while she was pregnant with her son, Paul-Anthony. She has suffered blackouts, panic attacks and a sense of self isolation. Ms. Troiani has expressed to her physicians on numerous occasions that she feels her life has been ruined. She has suffered from nightmares and has been at times totally disabled as a consequence of the psychological impact of this nightmarish trauma.

42. Ms. Troiani's injuries and damages were caused by the deliberate indifference of the City of Somerville and/or its agents, servants and employees in failing to exercise reasonable

care in the supervision and management of the police officers at the Putnam Street residence.

43. In addition, Ms. Troiani injuries are the direct result of the intentional acts of individual police officer defendants named in this case, and the policies, procedures and practices of the City of Somerville including, but not limited to a failure to provide minimal supervision or management control over police officers on the street.

## COUNT I

## CITY OF SOMERVILLE: VIOLATION OF 42 U.S.C. SECTION 1983

44. The above paragraphs are incorporated herein.

45. The City of Somerville has engaged in a systematic pattern of mismanagement, lack of supervision, failure to train, which are demonstrated, inter alia, by findings of an internal department study that individual supervisors within the Somerville Police Department do not see themselves as responsible for the actions of their subordinates and do not expect to take either disciplinary action or to even recommend discipline if they become aware of infractions by their subordinates.

46. In January 2001 a study by the MMA Consulting Group, Inc. of 41 West Street, Boston was provided to the City of Somerville and entitled "Management Study of the Police Department".

47. The purpose of the report was to assess the entire organization and functions of the Somerville Police Department. Policies, procedures, practices, equipment and facilities were reviewed and the MMA Consulting Group (herein after "MMA") analyzed the

entire department's organizational structure, internal communications, internal affairs, public communication, patrol strategies and techniques, training, staff development, records management and related functions.

48. In its preliminary summary the study group concluded:

> -Internal communications within the police department are not adequate;
> -Training is not adequate;
> -There is a lack of accountability in the Department;

49. Among other findings of the MMA study group was that the Somerville police department ".... does not plan for the future, it operates in a reactive mode and there is no evidence that the department has given consideration to future goals or how to deal with emergencies when they arise."

50. The study also noted that "....there were continual complaints about the failure of the current Police Department administration to correct the problems that have plagued the department for several years. These complaints were reinforced in responses to the employee attitude survey: more than seventy percent of those responding disagreed with the statement, "the chief of police is clearly concerned about the needs of the employees." A substantial majority of the persons interviewed, who represented a significant cross section of the department, expressed little confidence in the ability or the interest of the current chief of police to correct the many problems that continue to exist in the Somerville Police Department."

51. In a devastating summary MMA also stated:

> The overall reputation of the Department is that of a force with substantial internal turmoil. In addition to the "exam scam" scandal which occurred more than a decade ago, there have been two rather infamous incidents of alleged brutality that resulted in officers testifying against each other; the resulting divisiveness and factionalism remain today. During interviews with Somerville officers, supervisors and command staff, the consultants were told repeatedly of the open animosity and distrust that permeates the department. The divisiveness in the department is obvious and disruptive. <u>A member of the department referred to the police station as "the house of hate"</u> and we found considerable evidence to reinforce this view. Even the most casual observer must question the department's ability to function as a team under these conditions.
>
> (emphasis supplied)

52. MMA additionally found "there are no discernable standards for the performance in the department and officers are not held accountable for their own acts nor are supervisors held accountable for the actions of their subordinates. Some officers have expressed the view that good job performance means little. Officers who do good work are not rewarded and there are no sanctions for not doing the job."

53. In another section it was noted that individual supervisors ".... do not see themselves as responsible for the actions of their subordinates and are not expected to take disciplinary action, or even to recommend discipline if they become aware of infractions by their subordinates."

54. In another finding MMA noted that there was little evidence of supervision of patrol activities, Supervisors do not appear to know what their subordinates are doing.

55. The report found that there was no formal case management system and that some detectives were not trained in crime scene investigation. The department did not even have a crime scene processing unit nor were there trained evidence technicians on the

shifts to collect and process evidence. Patrol officers are not trained in crime scene processing nor are they equipped to handle even the most basic crime scene processing chores. Reiterating a common theme, MMA found that the criminal investigations division was inadequately organized and managed. Work was not appropriately organized and supervised.

56. In describing the vice and narcotics unit the MMA study noted that the narcotic unit members construct their own cases and follow up on leads and information received from informants and complainants. The sergeant supervising vice and narcotics was noted to have been out of work with an injury for several months in the prior year. MMA noted that "this type of unit should never be without supervision and oversight, especially for an extended period of time. It is the responsibility of the department to insure that adequate supervision is available at all times."

57. In describing records, MMA noted with some degree of prescience that there "... does not appear to be any degree of consistency in how and when offense reports are taken in the field. Officers may or may not decide to take an offense report, depending only upon their own initiative. There are no clear guidelines, no known policy requirements and certainly no supervisory oversight that will insure that reports are taken when needed. In some cases patrol officers call out detectives to take initial reports. This practice is not acceptable; patrol personnel should take most initial reports unless the case is such that immediate intervention by detectives is necessary, which would not normally be the case. <u>Unlike most police agencies supervisors in Somerville are not required to review or</u>

approve written reports prepared by their subordinates.

(Emphasis supplied)

58. As a consequence of the conclusions in this internal report, delivered to the city in January 2001, some four months before this event, the City of Somerville was on notice that there was a systematic failure to supervise, train, manage, and oversee the Police Department and that the inadequacies so noted were likely to result in the violation of constitutional rights, such that policy makers of the City could reasonably be said to have been deliberately indifferent to the rights of the public. Such an event, which victimized plaintiff Elizabeth Troiani included the failure to provide proper training, supervision and management by the City of Somerville, representing a policy for which the City is responsible and for which the City may be held liable for the acts committed against Elizabeth Troiani.

59. By the actions described above defendant City of Somerville, deprived the plaintiff, Elizabeth Troiani, of her clearly established rights guaranteed by the Constitution of the United States to be free from unreasonable search and seizure in violation of the Fourth, Fifth and Fourteenth amendments of the Constitution of the United States. As a direct result of this conduct plaintiff suffered the injuries described above.

## COUNT II

### 42 U.S.C. SECTION 1983: (ALL DEFENDANTS)

60. The above paragraphs are incorporated herein.

61. The defendants acting under color of law, deprived plaintiff of rights and freedoms

guaranteed under the Constitution of the United States and the laws and constitution of the Commonwealth of Massachusetts.

62. As approximate result of the acts, conduct, and omissions of the defendants as set forth in the paragraphs of this complaint plaintiff has been deprived of her civil rights including her right to be free from unreasonable search and seizure, her right to procedural and substantive due process of law and her right to privacy, all as guaranteed by the Fourth, Fifth and Fourteenth amendment to the United States Constitution and under the laws and constitution of the Commonwealth of Massachusetts.

63. The acts, conduct and omission of the defendants in depriving the plaintiff of her constitutionally guaranteed rights constitute a violation of 42 U.S.C. Section 1983.

## COUNT III
## MASSACHUSETTS CIVIL RIGHTS ACT G. L. CH. 12 SEC. 11 H-I
(ALL DEFENDANTS)

64. The above paragraphs are incorporated herein.

65. By engaging in the conduct described herein the individual defendants interfered by means of threats, intimidation and/or coercion with plaintiff Elizabeth Troiani's exercise and enjoyment of her rights, including the right to be free from unreasonable search and seizure, from being deprived the due process of law and from being deprived her right to privacy all guaranteed by the Fourth, Fifth and Fourteenth amendments to the United States Constitution and by the laws and constitution of the Commonwealth of Massachusetts. The individual defendants, therefore are liable to the plaintiff for violating her civil rights under Gen. Laws. Ch. 12, Sec. 11 H - 11 I.

## COUNT IV

## NEGLIGENCE COUNT PURSUANT TO M.G.L. CH.258 SEC. 4

66. The above paragraphs are incorporated herein.

67. Plaintiffs presented their claims against the defendant City of Somerville by written notice dated April 1, 2003 to Dorothy A. Gay, Mayor, the City of Somerville as well as to Lisa L. Meade, City Solicitor at the Somerville Law Department. Exhibit "A". They in turn failed to deny the claim in writing within six months of the date in which it was presented. Defendant City of Somerville is liable for the negligent and/or wrongful acts and/or omissions of its police officers who are acting within the scope of their employment while engaged in the conduct alleged herein.

## COUNT V

## NEGLIGENCE CLAIM AGAINST THE CITY OF SOMERVILLE

68. The above paragraphs are incorporated herein.

69. Defendant City of Somerville owed a duty to plaintiff to exercise due care in its instruction, supervision, training and monitoring of the defendants.

70. Said duty was breached by the City of Somerville in violation of Massachusetts law.

71. The City's breach of duty was the direct and proximate cause of the harm suffered by the plaintiff.

## COUNT VI

## MASSACHUSETTS PRIVACY ACT (G.L. CH.214 SEC. 1B)

(ALL DEFENDANTS)

72. The above paragraphs are incorporated herein.

73. By conducting an illegal search and seizure of the plaintiff defendants violated her right to privacy as guaranteed by G.L. Ch. 214 Sec. 1B

74. Plaintiff had a reasonable expectation of privacy in her body and she had a right not to be subjected to the above described searches without probable cause, or before being charged with any criminal offense.

75. By conducting the above described searches of plaintiff without cause the defendants unreasonably, substantially or seriously interfered with plaintiff's right of privacy.

## COUNT VII

## INTENTIONAL AND/OR RECKLESS INFLICTION OF EMOTIONAL DISTRESS

### (ALL DEFENDANTS)

76. The above paragraphs are incorporated herein.

77. The individual defendants conduct as alleged herein was extreme and outrageous.

78. The defendants knew or reasonably should have known that severe emotional distress was a likely consequence of their conduct in subjecting the plaintiff to an unlawful search and seizure, invasion of her privacy, violation of her civil rights without due process of law.

79. As a result of defendants conduct plaintiff suffered extreme emotional distress.

## COUNT VIII

## LOSS OF CONSORTIUM

### (ALL DEFENDANTS)

80. The above paragraphs are incorporated herein.

81. By the actions of the individual defendants plaintiff's minor son Paul-Anthony Hart has been deprived of the love, companionship and affection of his mother Elizabeth.

82. As a consequence of the actions of the defendants and as a proximate cause of the action of the defendants Elizabeth Troiani has suffered from acute post traumatic stress disorder, periodic blackouts, panic attacks and an exacerbation of a preexisting arthritic condition and aggravation of her preexisting hepatitis has impaired her ability to care for her son and provide him with the companionship and affection that Paul-Anthony could reasonably expect of his mother.

WHEREFORE plaintiffs request that this Court:

1. Award plaintiffs damages against the all defendants;

2. Award plaintiffs costs and attorney's fees pursuant to 42 U.S.C. Sec. 1988 and the Massachusetts Civil Rights Act;

3. Award punitive damages for the extreme and outrageous conduct of the individual defendants;

4. Award plaintiffs costs of this action and whatever additional relief this Court deems necessary and just, including prejudgment interest.

## PLAINTIFFS DEMAND A TRIAL BY JURY

Plaintiffs demand a trial by jury on all matters triable by right to a jury pursuant to Rule 38(a), of the F.R. Civ. P., as declared by the Seventh Amendment of the Constitution of the United States.

Elizabeth Troiani and
Paul-Anthony Hart
By their attorney

Michael C. Donahue
BBO #128940
Michael C. Donahue, P.C.
P.O. Box 610
South Easton, MA 02375-0610
(508)238-5501

April 2, 2004